UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

LEVAR SHANNON,

                Petitioner,                                Hon. Paul L. Maloney

v.                                                   Case No. 1:05-CV-634

MARY BERGHUIS,

                Respondent.

_____/

## REPORT AND RECOMMENDATION

        This matter is before the Court on Shannon's petition for writ of habeas corpus. In accordance with 28 U.S.C. § 636(b) authorizing United States Magistrate Judges to submit proposed findings of fact and recommendations for disposition of prisoner petitions, the undersigned recommends that Shannon's petition be **denied**.

## BACKGROUND

        As a result of having allegedly shot Ivan Jackson, Petitioner was charged with assault with the intent to murder, first degree home invasion, and possession of a firearm during the commission of a felony. Several individuals testified at Petitioner's jury trial. The relevant portions of their testimony are summarized below.

1

**Ivan Jackson**

Jackson testified that in late May 2002 or early June 2002, he borrowed $1,100 from Petitioner "to get a pound of weed." (Trial Transcript, January 21, 2003, 94). Jackson was unable, however, to obtain any marijuana because he "got robbed." (Tr. 94). Despite this circumstance, Jackson was still obligated to repay Petitioner the money he borrowed. (Tr. 94-95).

Jackson attempted to repay this debt by giving Petitioner "a gun" and $500. (Tr. 95). Petitioner instead demanded the remaining $600 and told Jackson that he would kill him unless he repaid the money. (Tr. 96-98). On a day in mid-June 2002, Petitioner entered Jackson's residence (at 1509 Wintercrest) and demanded his money. (Tr. 98-102). Jackson told Petitioner that he did not have the money, at which point Petitioner placed a gun on Jackson's chest and told him "if you don't have my money, I'm going to kill you." (Tr. 101). Petitioner then instructed Jackson to empty his pockets. (Tr. 101). Petitioner took Jackson's house keys and departed. (Tr. 101).

In the early morning hours of June 26, 2002, Jackson was awakened by a noise. (Tr. 102-03). Jackson "got up and went to the door" at which point he witnessed Petitioner entering his residence. (Tr. 103-04). Jackson then "ducked in the bathroom." (Tr. 103-04). Petitioner located Jackson and "pushed" him into the kitchen. (Tr. 104-05). Jackson told Petitioner that he "was going to pay him." (Tr. 106). Petitioner responded that he "wanted his money." (Tr. 106). Petitioner then shot Jackson in the chest. (Tr. 106-07). Jackson heard another shot, at which point he ran upstairs and told his roommate to call the police. (Tr. 107-08).

**Dean Kelley**

As of June 26, 2002, Kelley was employed as a police officer with the East Lansing

Police Department.  (Tr. 186-88).  At approximately 4:00 a.m. that morning, Kelley was dispatched to Ivan Jackson's residence.  (Tr. 188).  Upon arriving at Jackson's residence, Kelley observed that the door was open and that "there was a key in the door."  (Tr. 188-89).  Kelley discovered Jackson laying face down on the bedroom floor.  (Tr. 189).  Jackson appeared to be "very scared and upset, afraid."  (Tr. 190).  Jackson then asked a different police officer, "am I going to die?"  (Tr. 190).

**Richard Horwood**

As of June 26, 2002, Horwood was employed as a police officer with the East Lansing Police Department.  (Tr. 190-91).  At approximately 3:50 a.m. that morning, Horwood was dispatched to Ivan Jackson's residence.  (Tr. 191-92).  Upon arrival, Horwood discovered Jackson laying face down on the floor.  (Tr. 192).  Jackson told Horwood that "Var" shot him.  (Tr. 193).  Jackson said that "Var" shot him "because he's a bitch."  (Tr. 193).  Horwood later learned that "Var" referred to Petitioner, Levar Shannon.  (Tr. 193-95).

**Chisa Wilson**

Wilson testified that she had known Ivan Jackson for "about eight years" and that the two were "very close friends."  (Tr. 218).  Wilson testified that approximately one week before Jackson was shot she spoke with him on the telephone.  (Tr. 218-19).  While she was speaking with Jackson, the "conversation was interrupted."  (Tr. 219).  Jackson told Wilson, "hold on, someone came in the front door," immediately after which he put Wilson on hold.  (Tr. 219).  Jackson did not return to the telephone "for a while," so Wilson hung up.  (Tr. 219).  Jackson later telephoned Wilson.  (Tr. 219-20).  During this conversation, Jackson sounded "very different" and "his voice

3

was shaky." (Tr. 220). Jackson "sounded frightened." (Tr. 220). Jackson told Wilson that "Levar had came into his house and put a gun to his head, took his house key, and told him that he was going to be back and that he needed to have his money." (Tr. 220).

**James Crawford**

Crawford testified that he had known Ivan Jackson for "about five years." (Tr. 230-31). Crawford testified that Jackson borrowed $1,100 from Petitioner with which to purchase marijuana. (Tr. 234, 246). Crawford accompanied Jackson when he subsequently attempted to purchase marijuana. (Tr. 238-44, 248). Instead of obtaining marijuana, however, the pair was robbed of the money borrowed from Petitioner. (Tr. 241, 243, 248, 250-51, 288-89). Later that summer Crawford accompanied Jackson when he delivered to Petitioner's brother a nine millimeter handgun and five hundred dollars. (Tr. 231-34, 234, 260). This was intended to constitute partial repayment of the money which Jackson had borrowed from Petitioner to purchase marijuana. (Tr. 233-34). However, because Petitioner was unsure that Jackson would repay the remaining money, he obtained Crawford's bank card and Army identification as "collateral." (Tr. 278).

**Barbara Hulliberger**

As of June 26, 2002, Hulliberger was employed as a detective with the East Lansing Police Department. (Tr. 262-63). As part of the investigation into the shooting of Ivan Jackson, Hulliberger was dispatched to Petitioner's residence to execute a search warrant. (Tr. 267-68). A search of Petitioner's room revealed a safe, in which the following items were located: (1) marijuana residue; (2) a box of nine millimeter ammunition; (3) a Visa card belonging to James Crawford; and

4

(4) an Army identification card belonging to James Crawford.  (Tr. 268-72).

**David DeKorte**

As of June 26, 2002, DeKorte was employed as a police officer with the East Lansing Police Department.  (Tr. 293).  At approximately 4:45 a.m. DeKorte was dispatched to Ivan Jackson's residence.  (Tr. 294).  As he entered the residence he observed that "there was keys still stuck in the door."  (Tr. 295-96).

An examination of the kitchen revealed: (1) a spent shell casing; (2) a pillow; (3) a "couple" droplets of blood; (4) a "hole going through the wall;" and (5) a bullet hole in the floor. (Tr. 296).  A closer examination of the pillow revealed powder burns and a bullet hole on one side and a bullet exit hole on the other side.  (Tr. 296-99).  DeKorte also recovered a "large kitchen knife" which was laying on the counter.  (Tr. 299-300).  DeKorte observed blood on the stairway leading upstairs. (Tr. 296-97).  In an upstairs bedroom DeKorte discovered "some blood on the floor as well as a bloody T-shirt."  (Tr. 297).  An examination of the basement revealed several bullet fragments.  (Tr. 301).  Officers "followed the trajectory" of the bullet hole in the kitchen wall and discovered a bullet in the neighboring apartment.  (Tr. 302-03).

**Nicholas Corp**

In March 2002, Corp and Ivan Jackson moved in together and were roommates through the date of Jackson's shooting.  (Tr. 322-24).  Corp testified that "several days" before the shooting Jackson informed him that he had "lost" his apartment keys.  (Tr. 325).  In the early morning hours of June 26, 2002, Corp heard "two sounds" which he thought sounded like fireworks.

(Tr. 324-26).  After hearing these sounds, Corp heard Jackson "stumbling up the stairs."  (Tr. 326).

Jackson entered Corp's bedroom and told Corp that he had been shot.  (Tr. 326).

Corp initially thought Jackson was joking, but after turning on a light he could see that Jackson was

bleeding.  (Tr. 326-27).  Jackson fell down, at which point Corp telephoned 911.  (Tr. 327).  While

they were waiting for an ambulance to arrive, Jackson told Corp that he had been shot by "Emil."

(Tr. 327).  Corp reported that he and Jackson were "good friends" with Emil.  (Tr. 338).  Corp

testified that Emil had visited their apartment earlier that evening.  (Tr. 333, 338).  During this visit

there was no disagreement between Jackson and Emil; instead the pair watched television together.

(Tr. 338-39).  When Corp asked Jackson if he was sure that it had been Emil, Jackson responded,

"no."  (Tr. 327-28, 338, 341).  Corp later overheard Jackson inform a police officer that he had been

shot by "Levar."  (Tr. 327).


**Karlen Asabekov**

Asabekov testified that his nickname was Emil.  (Tr. 343-44).  Asabekov reported

that he had known Ivan Jackson since 1993.  (Tr. 344).  Asabekov testified that he visited Jackson

on the evening before the shooting.  (Tr. 345).  According to Asabekov, he arrived at Jackson's

apartment at approximately 7:30 p.m. to watch a hockey game on television.  (Tr. 345-46).

Asabekov left Jackson's apartment between 10:00 p.m. and 10:30 p.m. when his girlfriend arrived

to pick him up.  (Tr. 346).  Asabekov and his girlfriend drove straight back to Asabekov's residence

where they remained until the following morning.  (Tr. 346).  Asabekov and Jackson did not argue

during this visit and Asabekov was not upset with Jackson in any way.  (Tr. 346-47).  Asabekov

testified that he did not own a gun and did not shoot Jackson.  (Tr. 347).

**Melinda Serafin**

Serafin testified that Karlen Asabekov is her boyfriend. (Tr. 356). Serafin reported that she would "occasionally" pick up Asabekov from Ivan Jackson's apartment. (Tr. 356). Serafin testified that at approximately 10:30 p.m. on the night prior to Jackson's shooting she picked up Asabekov from Jackson's apartment. (Tr. 356-57). The pair then returned to Asabekov's residence where they both remained until the following morning. (Tr. 357-58).

**Doctor Mandip Atwal**

Dr. Atwal testified that on June 26, 2002, he was working as a trauma doctor at Sparrow Hospital when Ivan Jackson arrived at the hospital. (Trial Transcript, January 24, 2003, 366-68). Jackson had suffered a gunshot wound to the left chest and had experienced a "significant" amount of blood loss. (Tr. 368). Jackson was in "critical" condition on arrival, necessitating surgery which Dr. Atwal performed. (Tr. 368). The doctor testified that had the bullet entered Jackson's body "a centimeter one way or the other way, he could have been dead." (Tr. 370).

**Scott Despins**

As of June 26, 2002, Despins was employed as a police officer with the East Lansing Police Department. (Trial Transcript, January 24, 2003, 373-74). He participated in the collection of evidence from Ivan Jackson's residence following his shooting. (Tr. 374-75). Despins reported that the "initial information from the scene was that the suspect was wearing gloves." (Tr. 375-76). Investigators nonetheless searched for latent fingerprints in Jackson's residence and on various items of property discovered therein. (Tr. 375-77). The results of these efforts produced no evidence of

"identifiable" latent prints.  (Tr. 376).  Analysis of the bullet fragments recovered from the crime scene likewise revealed "no characteristics that were identifiable or meaningful."  (Tr. 376-77).

**Sheila Jackson**

Jackson testified that as of June 26, 2002, she was romantically involved with Petitioner.  (Tr. 399-400).  Between 1:00 a.m. and 2:00 a.m. on the morning of June 26, 2002, Jackson had a telephone conversation with Petitioner.  (Tr. 400-01). Jackson told Petitioner that she "would be waiting for him to come over."  (Tr. 401).  Petitioner responded that he "would be over in approximately 20 to 30 minutes."  (Tr. 401).  Jackson fell asleep before Petitioner arrived.  (Tr. 403-07).  Jackson awoke the following morning between 7:30 a.m. and 8:00 a.m., at which time Petitioner was asleep in her bed.  (Tr. 403).  Jackson testified that she did not know precisely what time Petitioner arrived at her residence.  (Tr. 404).

Following a jury trial, Petitioner was convicted of (1) first degree home invasion; (2) assault with intent to murder; and (3) possession of a firearm during the commission of a felony. (Tr. 483).  With respect to his convictions for assault with intent to murder and first degree home invasion, Petitioner received concurrent sentences of 9.5 to 25 years and 7-20 years, respectively. (Sentencing Transcript, March 26, 2003, 20).  Petitioner also received a two year sentence for possessing a firearm during the commission of a felony, to be served consecutively to his other sentences.  (Tr. 20).  Petitioner appealed his conviction to the Michigan Court of Appeals asserting the following claims:

> I.      Was Mr. Shannon denied due process under U.S.
>         Const. Am XIV and Mich. Const. 1963, Art. I § 17
>         because:

8

A.   The prosecutor "inherently prejudiced" Mr. Shannon by calling the complainant to the stand knowing he intended to invoke the Fifth Amendment privilege against self-incrimination,

B.   When the complainant invoked the Fifth Amendment privilege the trial court and the prosecutor forced him to testify despite his repeated protests in front of the jury, and

C.   The trial court failed to comply with her duties as a matter of law when the complainant indicated his desire to invoke his Fifth Amendment privilege, and the prosecutor failed to advise her that because the complainant wanted to invoke the privilege she needed to remove the jury and conduct a hearing?

II.   Was the jury's verdict against the great weight of the evidence, and based upon insufficient evidence, in violation of U.S. Const. Am. XIV; Mich. Const. 1963, Art. I § 17; was the error plain, did it affect Mr. Shannon's substantial rights under U.S. Const. Am. XIV, Mich. Const. 1963, Art. I § 17; and, if this court finds that defense counsel's failure to seek a ruling from the trial court as to Jackson's competence has waived this issue, then did counsel provide ineffective assistance of counsel under U.S. Const. Am. XIV, Mich. Const. 1963, Art. I §§ 17, 20?

III.   Did the trial court reversibly err in admitting Chisa Wilson's testimony under MRE 803(2) so that reversal is required where the evidence against Mr. Shannon was not overwhelming?

IV.   Was the trial court's instruction when the jury asked if it was deadlocked coercive and did it cause the jury to reach a verdict so that the error requires reversal?

V.    Did the cumulative effect of the errors deny Mr. Shannon due process under U.S. Const. Am. XIV, Mich. Const. 1963, Art. I § 17?

The Michigan Court of Appeals affirmed Petitioner's conviction. *People v. Shannon*, No. 250164, Opinion (Mich. Ct. App., Aug. 10, 2004). Asserting the following claims, Petitioner then moved in the Michigan Supreme Court for leave to appeal:

I.    The trial court and the prosecutor's joint misconduct deprived Mr. Shannon of a fair trial in violation of U.S. Const. Am. XIV, Mich. Const. 1963, Art. I § 17.

   A.    The prosecutor's misconduct in calling a witness who invoked the Fifth Amendment and with the assistance of the trial court, forcing him to testify, causing him to lie and to incriminate himself, then using his own coercion of the witness as proof of Defendant's guilt violates due process of law and requires reversal.

II.    The jury's verdict was against the great weight of the evidence, and it was based upon insufficient evidence, in violation of U.S. Const. Am. XIV, Mich. Const. 1963, Art. I § 17. The error was plain, and it affected Mr. Shannon's substantial rights under U.S. Const. Am. XIV, Mich. Const. 1963, Art. I § 17.

   A.    Mr. Jackson was not competent as a witness at trial where he stated he did not appreciate the obligation to tell the truth. To the extent this issue is waived by counsel's failure to object, then Mr. Shannon received ineffective assistance of counsel in violation of his rights under U.S. Const. Ams. VI, XIV and Mich. Const. 1963, Art. I §§ 17, 20.

III.    The Court of Appeals' factual findings that were unsupported by anything in the record and that were

10

negated by facts of record deprived Mr. Shannon of his right to fair review on his appeal of right, so that reversal is required.

IV.    The deliberate evidentiary error that the prosecutor inserted on the record when it proffered Chisa Wilson's testimony about Jackson as excited utterance, and the trial court's erroneous decision to allow it was rubber-stamped by the Court of Appeals, Mr. Shannon's right to due process and a fair trial when considered together with the judicial and prosecutorial misconduct that dominated the proceedings.

V.    The trial court coerced the jury to reach a verdict by telling them that they were not deadlocked, implying that, as the judge, she knew when the "deadlock stage" has arrived, and telling them they had not reached the "deadlock stage."

VI.    The cumulative effect of the violations of Mr. Shannon's right to due process and a fair trial require reversal because they created a violation of due process as a whole in violation of joint misconduct deprived Mr. Shannon of a fair trial in violation of U.S. Const. Am. XIV and Mich. Const. 1963, Art. I § 17.

The court denied Petitioner's request for leave to appeal, stating that "we are not persuaded that the questions presented should be reviewed by this Court." *People v. Shannon*, No. 127159, Order (Mich., April 26, 2005).

On September 19, 2005, Petitioner submitted the present petition for writ of habeas corpus in which he asserts the following claims:

I.    The joint misconduct of the trial court and the prosecutor deprived Petitioner of a fair trial.

II.    The court of appeals improperly made factual findings that were unsupported and negated by the record.

11

III.    The trial court should have granted directed verdict in Petitioner's favor where the only evidence of the elements of the charged offenses came from the testimony of an incompetent witness.

IV.    The court reversibly erred in admitting Chisa Wilson's hearsay testimony about Jackson where there was no foundation establishing that it was probative or that Jackson made an excited utterance.

V.    The trial court coerced the jury to reach a verdict by telling them that they were not deadlocked.

VI.    The cumulative effect of the due process violations deprived Petitioner of a fair trial.

## **STANDARD OF REVIEW**

Shannon's petition, filed September 19, 2005, is subject to the provisions of the Antiterrorism and Effective Death Penalty Act (AEDPA), as it amended 28 U.S.C. § 2254.  The AEDPA amended the substantive standards for granting habeas relief under the following provisions:

(d)    An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim —

(1)    resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States, or

(2)    resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

12

The AEDPA has "modified" the role of the federal courts in habeas proceedings to "prevent federal habeas 'retrials' and to ensure that state-court convictions are given effect to the extent possible under law." *Bell v. Cone*, 535 U.S. 685, 693 (2002).

Pursuant to § 2254(d)(1), a decision is "contrary to" clearly established federal law when "the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." *Williams v. Taylor*, 529 U.S. 362, 412-13 (2000); *see also, Lancaster v. Adams*, 324 F.3d 423, 429 (6th Cir. 2003).

Prior to *Williams*, the Sixth Circuit interpreted the "unreasonable application" clause of § 2254(d)(1) as precluding habeas relief unless the state court's decision was "so clearly incorrect that it would not be debatable among reasonable jurists." *Gordon v. Kelly*, 2000 WL 145144 at *4 (6th Cir., February 1, 2000); *see also*, *Blanton v. Elo*, 186 F.3d 712, 714-15 (6th Cir. 1999). The *Williams* Court rejected this standard, indicating that it improperly transformed the "unreasonable application" examination into a subjective inquiry turning on whether "at least one of the Nation's jurists has applied the relevant federal law in the same manner" as did the state court. *Williams*, 529 U.S. at 409.

In articulating the proper standard, the Court held that a writ may not issue simply because the reviewing court "concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Williams,* 529 U.S. at 411. Rather, the Court must also find the state court's application thereof to be *objectively* unreasonable. *Bell*, 535 U.S. at 694; *Williams*, 529 U.S. at 409-12. Accordingly, a state court unreasonably applies clearly established federal law if it "identifies the correct governing legal rule

13

from [the Supreme] Court's cases but unreasonably applies it to the facts of the particular. . .case" or "if the state court either unreasonably extends a legal principle from [the Supreme Court's] precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply." *Lancaster*, 324 F.3d at 429 (quoting *Williams*, 529 U.S. at 407).

Furthermore, for a writ to issue, the Court must find a violation of Supreme Court authority.  The Court cannot look to lower federal court decisions in determining whether the relevant state court decision was contrary to, or involved an unreasonable application of, clearly established Federal law.  *See Harris v. Stovall*, 212 F.3d 940, 943-44 (6th Cir. 2000).

Pursuant to 28 U.S.C. § 2254(d)(2), when reviewing whether the decision of the state court was based on an unreasonable determination of the facts in light of the evidence presented, the factual findings of the state court are presumed to be correct.  *See Warren v. Smith*, 161 F.3d 358, 360 (6th Cir. 1998) (citing 28 U.S.C. § 2254(e)(1)).  Petitioner can rebut this presumption only by clear and convincing evidence.  *Id.*

## ANALYSIS

### I.        Prosecutorial and Judicial Misconduct

At the outset of his testimony, Ivan Jackson expressed a reluctance to testify, as evidenced by the following exchange:

| | |
|---|---|
| Prosecutor: | Let me ask you this, Mr. Jackson. |
| Jackson: | Can I take a break for a minute? |
| The Court: | Sir, you're not feeling well or do you wish to have some water? |

14

Jackson:        I just don't feel like doing this.  I
                don't want to do this.  I don't want to
                have nothing to do with this.

The Court:      I need you to speak louder.

Jackson:        I don't want nothing to do with this.

The Court:      Can we go off the record, please?

Prosecutor:     I don't want to go off the record.  Can
                I ask him a question?

The Court:      Yes, you may.

Prosecutor:     Who were you with out in the hallway
                here just moments ago?

Jackson:        His mom and dad.

Prosecutor:     Who's mom and dad?

Jackson:        Levar's.

Prosecutor:     Levar's mom and dad?

Jackson:        Yeah.

Prosecutor:     His brother there too?

Jackson:        Yeah.

Prosecutor:     You guys talking about something?

Jackson:        Yeah.  I mean I live by the streets, he
                live by the streets.  I suffer the
                consequences, I took it.  It's whatever.
                You know, it's done.  I still love him
                regardless, and I don't want to go
                through this.  I have a life to live.  He
                got a life to live.  He had shit to look
                forward to.  I have shit to look
                forward to, and I don't want to do it,
                you know.  I just can't do it.  I don't

see fit.

Prosecutor: What do you mean you suffer consequences?

Jackson: That's the game.  I played that game. I suffered the consequences.  I got shot for playing the game.  You know, that's part of the game.  You know, he played the game harder than I did, just like my stepfather told me, you know, so I am just not going to do it.  I'm not going to deal with it.

Prosecutor: Your Honor, I'm going to ask you to direct the witness to answer the questions put to him.

The Court: Sir -

Jackson: But I don't -

The Court: This is not your choice.

Jackson: But I can plead the Fifth?

The Court: I want you to listen to me first.  You need to answer the questions that are asked.  You need to answer them truthfully.  Sir, would you please sit up when I'm talking to you?  You look directly at me.  I want you to answer the questions that are asked in a truthful manner.  Do you understand me?  These are not your decisions to make.  Now, I'll ask you, do you understand me?

Jackson: Yeah.

The Court: You may proceed.

(Trial Transcript, January 21, 2003, 90-92).

16

Following this exchange, Jackson answered several questions posed to him by the prosecutor. (Tr. 93-95). However, when asked about the events that resulted in his shooting, Jackson attempted to assert his Fifth Amendment privilege not to incriminate himself. (Tr. 95-96, 99). The court rejected Jackson's attempt to avoid testifying, finding that Jackson was not entitled to assert his Fifth Amendment privilege. (Tr. 96-96, 99). Jackson then resumed answering the prosecutor's questions without incident. (Tr. 99-108). Petitioner asserts that the prosecuting attorney engaged in misconduct by calling Ivan Jackson to the stand. Petitioner further asserts that the trial judge engaged in misconduct by forcing Jackson to testify against his will.

A.       Prosecutorial Misconduct

Petitioner asserts that the prosecutor's actions in this matter run afoul of *Namet v. United States*, 373 U.S. 179 (1963). In *Namet*, the Court observed that prosecutorial misconduct can occur where a prosecutor attempts to establish its case "out of inferences arising from the use of the testimonial privilege." *Namet*, 373 U.S. at 186; *see also*, *Thomas v. Garraghty*, 18 Fed. Appx. 301, 308-11 (6th Cir., Aug. 23, 2001). Specifically, the *Namet* Court recognized that such misconduct can occur in two circumstances.

As the Court recognized, "when a witness is asked whether he participated in criminal activity with the defendant, a refusal to answer based on the privilege against self-incrimination tends to imply to the jury that a truthful answer would be in the affirmative." *Namet*, 373 U.S. at 185-86. Accordingly, it may be inappropriate for a prosecuting attorney to rely on such an inference to establish his case. *See Namet*, 373 U.S. at 186. The *Namet* Court also recognized that in certain circumstances "inferences from a witness' refusal to answer" may add "critical weight

to the prosecution's case in a form not subject to cross-examination" and thus unfairly prejudice a criminal defendant. *Namet*, 373 U.S. at 187.

Neither of these circumstances is implicated in this matter. While Jackson was questioned about borrowing money from Petitioner for the purposes of purchasing marijuana, any inferences which might have resulted from the failure to answer such questions would not establish the prosecution's case against Petitioner. The crimes with which Petitioner was charged were only tangentially related to Jackson's attempt to purchase marijuana with money borrowed from Petitioner. Instead, the crimes with which Petitioner was charged related to his subsequent attempt to murder Jackson. Furthermore, while Jackson was initially reluctant to testify, out of a fear of retaliation, he ultimately answered every question posed to him by the prosecutor and defense counsel. Thus, this is not a circumstance in which a failure to answer questions could lead to an inference which could be used as a substitute for the evidence necessary to establish the essential elements of the crimes with which Petitioner was charged.

Petitioner further asserts that the prosecuting attorney engaged in misconduct by calling Jackson to testify knowing that he would attempt to assert his Fifth Amendment privilege against self-incrimination. Courts recognize that "under certain circumstances, the prosecutor's act of forcing a witness to claim the Fifth Amendment privilege could create an inference unfavorable to the defendant." *Garraghty*, 18 Fed. Appx. at 309. However, contrary to Petitioner's suggestion there does not exist any bright-line rule that reversible error occurs whenever a witness asserts his Fifth Amendment privilege in the jury's presence. As the *Garraghty* court stated, "[t]he *Namet* Court eschewed a bright-line rule and, instead, emphasized the importance of examining the circumstances surrounding each witness's refusal to testify." *Garraghty*, 18 Fed. Appx. at 308.

18

The circumstances in this matter do not in any way suggest that the prosecutor acted improperly by calling Jackson to testify. There is no evidence that the prosecutor knew that Jackson would attempt to assert his Fifth Amendment privilege when called to testify. Moreover, even if Jackson had prior to trial indicated the desire to assert the privilege, as the *Namet* Court recognized, "the prosecutor need not accept at face value every asserted claim of privilege, no matter how frivolous." *Namet*, 373 U.S. at 188. As previously noted, the trial court determined that there existed no legitimate basis for Jackson to assert his Fifth Amendment privilege not to testify. Furthermore, considering that Jackson was the target of Petitioner's criminal actions the prosecutor properly called Jackson to testify. *See Namet*, 373 U.S. at 188 (recognizing that even if a witness could properly invoke his Fifth Amendment privilege as to certain questions, it is nonetheless appropriate to question such a witness if he can provide non-privileged testimony which supports the prosecution's theory).

When a petitioner makes a claim of prosecutorial misconduct, "the touchstone of due process analysis...is the fairness of the trial, not the culpability of the prosecutor." *Serra v. Michigan Dep't of Corrections*, 4 F.3d 1348, 1355 (6th Cir. 1993) (quoting *Smith v. Phillips*, 455 U.S. 209, 219 (1982)). The issue is whether the prosecutor's conduct "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Gillard v. Mitchell*, 445 F.3d 883, 897 (6th Cir. 2006) (quoting *Darden v. Wainwright*, 477 U.S. 168, 181 (1986)). For the reasons discussed herein, the prosecutor's act of calling Ivan Jackson to testify was not inappropriate and did not deprive Petitioner of the right to a fair trial.

B.      Judicial Misconduct

19

Petitioner further asserts that the trial judge engaged in misconduct by forcing Ivan Jackson to testify against his will.  In support of his argument, Petitioner relies on *Webb v. Texas*, 409 U.S. 95 (1972).

In *Webb*, the defendant sought to call to the stand a single witness, Leslie Mills, who was presently serving a prison sentence.  *Id.* at 95.  Before permitting Mills to testify, however, the judge instructed him as follows:

> Now you have been called down as a witness in this case by the Defendant.  It is the Court's duty to admonish you that you don't have to testify, that anything you say can and will be used against you.  If you take the witness stand and lie under oath, the Court will personally see that your case goes to the grand jury and you will be indicted for perjury and the liklihood (sic) is that you would get convicted of perjury and that it would be stacked onto what you have already got, so that is the matter you have got to make up your mind on.  If you get on the witness stand and lie, it is probably going to mean several years and at least more time that you are going to have to serve.  It will also be held against you in the penitentiary when you're up for parole and the Court wants you to thoroughly understand the chances you're taking by getting on that witness stand under oath.  You may tell the truth and if you do, that is all right, but if you lie you can get into real trouble.  The court wants you to know that.  You don't owe anybody anything to testify and it must be done freely and voluntarily and with the thorough understanding that you know the hazard you are taking.

*Id.* at 95-96.

The judge did not admonish in this manner any of the witnesses called to testify by the prosecution.  *Id.* at 96-97.  Not surprisingly, Mills declined to testify, thereby depriving the defendant of the testimony of his only witness.  *Id.* at 96.

The Supreme Court found that the trial judge's actions deprived Webb of the right to a fair trial.  *Id.* at 97-98.  As the Court observed:

> The trial judge gratuitously singled out this one witness for a lengthy

20

admonition on the dangers of perjury.  But the judge did not stop at warning the witness of his right to refuse to testify and of the necessity to tell the truth.  Instead, the judge implied that he expected Mills to lie, and went on to assure him that if he lied, he would be prosecuted and probably convicted for perjury, that the sentence for that conviction would be added on to his present sentence, and that the result would be to impair his chances for parole.

*Id.* at 97.

The Court concluded that "the judge's threatening remarks, directed only at the single witness for the defense, effectively drove that witness off the stand, and thus deprived [Webb] of due process of law."  *Id.* at 98.

The present circumstance in no way resembles that present in *Webb*.  The trial judge in this matter did not admonish Jackson prior to his taking the stand.  When Jackson repeatedly expressed his reluctance to testify, the judge simply informed him that he could not validly assert his Fifth Amendment privilege not to testify, but instead must truthfully answer the questions posed to him.  The judge did not threaten Jackson or express the belief that he would not testify truthfully.  Finally, unlike the witness in *Webb*, Jackson testified and was subjected to cross-examination.  The trial judge's comments in this matter were appropriate and did not deprive Petitioner of the right to a fair trial.

The Michigan Court of Appeals determined that these claims were without merit.  *People v. Shannon*, No. 250164, Opinion at 2 (Mich. Ct. App., Aug. 10, 2004).  In light of the above authority and facts, the Court concludes that this decision is neither contrary to, nor involves an unreasonable application of, clearly established federal law.  Furthermore, this decision was not based on an unreasonable determination of the facts in light of the evidence presented.  Accordingly, these claims raise no issue upon which habeas relief may be granted.

## II.          Sufficiency of the Evidence Claim

Petitioner asserts that he is entitled to habeas relief because the prosecution failed to present sufficient evidence to "establish every element of the charged crimes beyond a reasonable doubt."

Claims challenging the sufficiency of the evidence are governed by the standard articulated in *Jackson v. Virginia*, 443 U.S. 307 (1979), pursuant to which it must be determined whether viewing the evidence in the light most favorable to the prosecution and according the benefit of all reasonable inferences to the prosecution, any rational trier of fact could have found Petitioner guilty beyond a reasonable doubt. *See O'Hara v. Brigano*, 499 F.3d 492, 499 (6th Cir. 2007) (citing *Jackson*, 443 U.S. at 319-26).  Furthermore, where the record supports conflicting inferences the Court "must presume - even if it does not affirmatively appear in the record - that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution."  *O'Hara*, 499 F.3d at 499 (quoting *Jackson*, 443 U.S. at 326).

Pursuant to Michigan law in effect as of the date Petitioner committed the acts for which he was convicted, an individual was guilty of first degree home invasion if the following elements were satisfied: (1) the defendant broke into and entered a dwelling or entered a dwelling without permission, (2) that when the defendant broke into and entered the dwelling or entered the dwelling without permission he did so with the intent to commit a felony or larceny therein, and (3) any time while the defendant was entering, present in, or exiting the dwelling the defendant was armed with a dangerous weapon or another person was lawfully present in the dwelling.  Mich. Comp. Laws § 750.110a(2) (1997); *see also*, *People v. Moore*, 1997 WL 33344905 at *1 (Mich. Ct. App., Sep. 5, 1997).  The intent to commit a felony or larceny in the dwelling "cannot be presumed

22

solely from proof of the breaking and entering." *Moore*, 1997 WL 33344905 at *1 (citing *People v. Uhl*, 425 N.W.2d 519 (Mich. Ct. App. 1988)).  Nonetheless, the requisite intent "may reasonably be inferred from the nature, time, and place of defendant's acts before and during the breaking and entering." *Moore*, 1997 WL 33344905 at *1.

Pursuant to Michigan law in effect at the time of Petitioner's attack on Ivan Jackson, an individual was guilty of assault with the intent to commit murder if the following elements were satisfied: (1) an assault, (2) with an actual intent to kill, and (3) which, if successful, would make the killing murder. *People v. Davis*, 549 N.W.2d 1, 4 (Mich. Ct. App. 1996).  The intent to kill may be proven by inference from "any facts in evidence." *Id.*

Pursuant to Michigan law then in effect, an individual was guilty of possession of a firearm during the commission of a felony if he possessed a firearm during the commission of or attempted commission of any felony, except for those felonies specifically enumerated by statute (none of which are presently applicable). *People v. Mitchell*, 575 N.W.2d 283, 284-85 (Mich. 1998).

Viewing the evidence detailed above in a light most favorable to the prosecution, and according the benefit of all reasonable inferences to the prosecution, a reasonable juror could certainly have found Petitioner guilty beyond a reasonable doubt of first degree home invasion, armed robbery, and possession of a firearm during the commission of a felony.  Petitioner counters that because Ivan Jackson was an "incompetent" witness his testimony cannot be considered when assessing whether there existed sufficient evidence to support his convictions.  With respect to this particular claim, the Michigan Court of Appeals concluded:

> Defendant also argues that the victim's testimony was unreliable and uncorroborated, so we should essentially strike it on appeal.  We disagree.  Not only do the facts in the record contradict defendant's premise, but we leave such questions of credibility to the trier of fact.

23

> The victim's reluctance to testify and his testimonial inconsistencies affected his credibility, not his competence. Therefore, the testimony was properly offered and provided sufficient basis for the jury's verdict.

*People v. Shannon*, No. 250164, Opinion at 2 (Mich. Ct. App., Aug. 10, 2004).

In light of the above authority and facts, the Court concludes that this decision is neither contrary to, nor involves an unreasonable application of, clearly established federal law. Furthermore, this decision was not based on an unreasonable determination of the facts in light of the evidence presented. Accordingly, this claim raises no issue upon which habeas relief may be granted.

**III.          Evidentiary Claim**

As detailed above, Chisa Wilson testified that approximately one week before Jackson was shot she spoke with him on the telephone. (Trial Transcript, Jan. 23, 2003, 218-19). While she was speaking with Jackson, the "conversation was interrupted." (Tr. 219). Jackson told Wilson, "hold on, someone came in the front door," immediately after which he put Wilson on hold. (Tr. 219). Jackson did not return to the telephone "for a while," so Wilson hung up. (Tr. 219). Jackson later telephoned Wilson. (Tr. 219-20). During this conversation, Jackson sounded "very different" and "his voice was shaky." (Tr. 220). Jackson "sounded frightened." (Tr. 220). Jackson told Wilson that "Levar had came into his house and put a gun to his head, took his house key, and told him that he was going to be back and that he needed to have his money." (Tr. 220).

Petitioner objected to the admission of Wilson's testimony regarding the comments that Petitioner allegedly made to Jackson on the grounds that it constituted inadmissible hearsay. (Tr. 201, 210-15). The trial court disagreed, finding that Wilson's testimony regarding such was

24

admissible pursuant to the excited utterance exception to the hearsay rule.  Petitioner claims that he is entitled to habeas relief as a result of this evidentiary ruling.

To establish constitutional error, Petitioner cannot simply argue that the trial court's evidentiary ruling was improper, as "federal habeas corpus relief does not lie for errors of state law." *Estelle v. McGuire*, 502 U.S. 62, 67 (1991).  Rather, Petitioner must establish that his conviction violated the Constitution, laws, or treaties of the United States.  *Id.*

Generally, errors by a state court on matters involving the admission or exclusion of evidence are not cognizable in a federal habeas proceeding.  *See Bugh v. Mitchell*, 329 F.3d 496, 512 (6th Cir. 2003).  However, if "an evidentiary ruling is so egregious that it results in a denial of fundamental fairness, it may violate due process and thus warrant habeas relief."  *Id.*  Fundamental fairness does not, however, "require a perfect trial," *Clemmons v. Sowders*, 34 F.3d 352, 358 (6th Cir. 1994), and courts have defined those violations that violate fundamental fairness "very narrowly."  *Bugh*, 329 F.3d at 512.  State court evidentiary rulings do not offend due process unless they violate "some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental."  *Id.* (citations omitted).

The decision by the trial judge to admit the testimony in question was reasonable. Furthermore, considering that Petitioner had the opportunity to cross-examine Ivan Jackson about the comments at issue and the circumstances in which they were made, the Court fails to discern how the admission of Chisa Wilson's testimony deprived Petitioner of a fair trial.  *See, e.g., Crawford v. Washington*, 541 U.S. 36 (2004) (it does not offend the Constitution to admit hearsay testimony if hearsay declarant testifies at trial and is subject to cross-examination).  Accordingly, this claim raises no issue upon which habeas relief may be granted.

**IV.        Jury Instruction Claim**

The jury began deliberating in this matter at 3:05 p.m. on Friday, January 24, 2003.

(Trial Transcript, Jan. 24, 2003, 476).  At 5:01 p.m., the judge released the jurors for the weekend.

(Tr. 477).  The jurors returned to the court on Monday, January 27, 2003, and resumed deliberating

at 9:32 a.m.  (Trial Transcript, Jan. 27, 2003, 481).  Less than one hour later the jury returned to the

courtroom, at which point the following exchange occurred:

> The Court:      All rise.  Thank you.  You may be seated.  We're back on the record in People versus Levar Darnell Shannon. I'd like to thank the jurors for coming in this morning, and my law clerk was able to give me an indication that you wanted to know if you were deadlocked.  The bottom line is that on Friday you had a couple of hours to really get the case and deliberate, and then this morning maybe a half an hour, so you're not at that stage.  If it does occur, then we'll deal with that when it happens, but in this Court's opinion, I talked to the prosecutor and defense attorney, there simply really hasn't been enough time to continue to talk, keep an open mind, listen to the opinions of your fellow jurors.  I do not want you to give up your individuality on your opinion, but I do want you to continue to deliberate. And then we will, as time progresses, we'll see where we stand.  Is there anything further, Prosecutor, defense?
>
> Mr. Smith:     No, Your Honor.
>
> Mr. Evelyn:    No, Your Honor, thank you.

(Tr. 481-82).

The jury reached a verdict approximately three hours later.  (Tr. 483).  Petitioner asserts that the comments quoted above demonstrate that the "trial court coerced the jury to reach a verdict."

The Supreme Court has long approved the practice of administering a "supplemental charge" to a jury that has expressed its inability to reach a verdict.  *See Lowenfield v. Phelps*, 484 U.S. 231, 237 (1988) (citing *Allen v. United States*, 164 U.S. 492 (1896)).  A supplemental jury charge violates the Constitution only if it is improperly coercive.  *See Lowenfield*, 484 U.S. at 237; *Henderson v. Collins*, 262 F.3d 615, 619 (6th Cir. 2001).  When assessing whether a supplemental jury charge is improperly coercive, the Court must "consider the supplemental charge given by the trial court 'in its context and under all the circumstances.'"  *Lowenfield*, 484 U.S. at 237.  The *Lowenfield* Court further observed that:

> The very object of the jury system is to secure unanimity by a comparison of views, and by arguments among the jurors themselves. It certainly cannot be the law that each juror should not listen with deference to the arguments and with a distrust of his own judgment, if he finds a large majority of the jury taking a different view of the case from what he does himself.  It cannot be that each juror should go to the jury room with a blind determination that the verdict shall represent his opinion of the case at that moment; or, that he should close his ears to the arguments of men who are equally honest and intelligent as himself.

*Id.* (quoting *Allen*, 164 U.S. at 501-02).

An examination of the context in which the supplemental jury charge occurred, as well as the contents thereof, reveals that Petitioner did not suffer a violation of his constitutional rights.  First, the jury had deliberated for less than three hours before the court administered the challenged supplemental charge.  This weighs against Petitioner's position.  *See Lowenfield*, 484

27

U.S. at 238 (recognizing that where the jury has deliberated for only a brief period of time, the court has the authority to instruct the jury to deliberate further).

Moreover, the Court discerns nothing in the trial judge's comments which can reasonably be interpreted as coercive.  The judge did not inquire as to the numerical breakdown or status of the jury's deliberations, nor did her comments single out or focus on those jurors who may have held minority viewpoints.  *See Williams v. Parke*, 741 F.2d 847, 850-52 (6th Cir. 1984).  Instead, the judge instructed every juror to "keep an open mind" and "listen to the opinions of your fellow jurors."  The judge further instructed every juror not to surrender "your individuality on your opinion."  Such comments hardly constitute coercion.  In rejecting Petitioner's argument, the Michigan Court of Appeals concluded that:

> Here, the trial court told the jury members to keep an open mind, but not to give up their own opinions.  The trial court did not coerce or threaten the jury into reaching a decision.  Therefore, defendant has failed to show any error.

*People v. Shannon*, No. 250164, Opinion at 3 (Mich. Ct. App., Aug. 10, 2004).

In light of the above authority and facts, the Court concludes that this decision is neither contrary to, nor involves an unreasonable application of, clearly established federal law.  Furthermore, this decision was not based on an unreasonable determination of the facts in light of the evidence presented.  Accordingly, this claim raises no issue upon which habeas relief may be granted.

### V.     Cumulative Error Claim

Petitioner asserts that he is entitled to habeas relief based on the "cumulative effect" of the errors which occurred during his trial.  First, Petitioner has failed to identify any errors or

violations of federal law which occurred during his trial.  Furthermore, as the Sixth Circuit has made

clear, habeas relief cannot be premised upon an alleged accumulation of errors.  *See Moore v.*

*Parker*, 425 F.3d 250, 256 (6th Cir. 2005).


## CONCLUSION

For the reasons articulated herein, the undersigned concludes that Petitioner is not

being confined in violation of the laws, Constitution, or treaties of the United States.  Accordingly,

the undersigned recommends that Shannon's petition for writ of habeas corpus be **denied**.

OBJECTIONS to this Report and Recommendation must be filed with the Clerk of

Court within ten (10) days of the date of service of this notice.  28 U.S.C. § 636(b)(1)(C).  Failure

to file objections within the specified time waives the right to appeal the District Court's order.

*Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).

Respectfully submitted,


Date:  July 3, 2008                                     /s/ Ellen S. Carmody
                                                       ELLEN S. CARMODY
                                                       United States Magistrate Judge


29