UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

|
|
LEVAR SHANNON,                                  |        Case No. 1:05-CV-634
|
    Petitioner,                                 |            HONORABLE PAUL L. MALONEY
|
        v.                                      |
|
MARY BERGHUIS,                                  |
|
    Respondent.                                 |
|

### Opinion and Order

**Overruling the Plaintiff's Objections;
Adopting the Report and Recommendation;
Dismissing the Habeas Corpus Petition**

Following jury convictions for assault with the intent to murder, first-degree home invasion, and possession of a firearm during the commission of a felony, Shannon was sentenced to 9.5 to 25 years and 7-20 years concurrent and a consecutive term of two years.

On direct appeal to the Michigan Court of Appeals, Shannon contended that he was denied a fair trial when the victim attempted to invoke his Fifth Amendment privilege against self-incrimination. *See People v. Shannon*, 2004 WL 1779012, *1 (Mich. App. Aug. 10, 2004) (p.c.) (P.J. Murray, JJ. Markey & O'Connell). The Court of Appeals held that Shannon lacked standing to make that argument, and that the argument lacked merit because the victim acknowledged that the reason for his initial desire not to testify was fear of violent retribution, not fear of self-incrimination; because Shannon failed to demonstrate a risk that the jury found him guilty by

association with someone else; and that victim, who had no cognizable Fifth Amendment ground for not testifying, eventually testified anyway.  *Id.*

Also on direct appeal, Shannon argued that the victim lacked the sense of obligation to testify truthfully as required by FED. R. EVID. 601.  *Shannon*, 2004 WL 1779012 at *2.  The Michigan Court of Appeals rejected that argument, reasoning that Shannon failed to challenge the victim's competence to testify in the trial court and that he therefore had to show plain error; that he failed to show plain error, because the victim's stated fear of retaliation made it unlikely that he would lie to inculpate Shannon; and that Shannon's trial counsel therefore did not rendered ineffective assistance by failing to raise this baseless argument about the victim's competence to testify.  *Id.*

Shannon's third argument on direct appeal was that the victim's testimony was unreliable and uncorroborated, but the Michigan Court of Appeals rejected this argument as going to the victim's credibility rather than his competence.  *Shannon*, 2004 WL 1779012 at *2.

Shannon's fourth argument on direct appeal was that the trial court erred by admitting the testimony of his friend, Chisa Wilson, under the excited utterance exception to the hearsay rule, to the effect that Shannon had just come into his house uninvited, put a gun to his head, and stated that he wanted his money.  The Michigan Court of Appeals rejected that argument, determining that when the victim made the alleged statement to declarant Wilson, the victim was still  under the excitement of being threatened at gunpoint by Shannon, and the startling event was corroborated by independent evidence at trial, namely the victim's testimony.  *Shannon*, 2004 WL 1779012 at *2.

Shannon's fifth argument on direct appeal was that the trial court's deadlock instruction to the jury was coercive.  The Michigan Court of Appeals rejected this argument, reasoning that although the trial court had not used the exact language of the standard deadlock instruction, its

instruction was not coercive, as it had told the jurors to keep an open mind but not give up their own opinions. *Shannon*, 2004 WL 1779012 at *2. Finally, because Shannon failed to show any errors, his cumulative-error argument failed. *Id.* at *3.

Shannon timely sought review from the Michigan Supreme Court, contending that the prosecutor and the trial court together improperly forced the victim to testify in the face of his initial invocation of the Fifth Amendment privilege against self-incrimination; that the verdict was against the weight of the evidence, that the victim was not competent to testify where he stated that he did not appreciate his duty to tell the truth, and that trial counsel rendered constitutionally ineffective assistance by failing to raise this issue; that the Michigan Court of Appeals' factual findings were unsupported by the record and were negated by facts in the record; that the Court of Appeals rubber-stamped the trial court's erroneous admission of Wilson's statement under the excited-utterance exception to the hearsay rule; that the trial court coerced the jury by telling them that they had not yet reached the deadlock stage; and that these errors cumulatively violated Shannon's right to a fair trial. The Michigan Supreme Court denied leave to appeal without opinion. *See People v. Shannon*, 695 N.W.2d 75 (Mich. Apr. 26, 2005) (No. 127159) (table decision).

About five months later, in September 2005, Shannon filed the instant petition for a writ of habeas corpus, raising essentially the same six assignments of error that he raised in his motion for leave to appeal to the Michigan Supreme Court. On July 3, 2008, the Magistrate Judge issued a Report and Recommendation ("R&R") recommending that this court deny all of Shannon's habeas claims on their merits. Shannon timely filed objections on July 17, 2008, and the government timely filed a response to the objections on August 4, 2008. For the reasons that follow, the court will overrule Shannon's objections and adopt the R&R.

-3-

**After recounting victim Ivan Jackson's exchange with the trial court and the prosecutor about whether or not he would testify or invoke his Fifth Amendment privilege against self-incrimination,** *see* **R&R at 14-17, the Magistrate Judge correctly concluded that neither the trial judge nor the prosecutor acted improperly.**

First, the Magistrate recognized the danger that when a witness refuses to answer whether he participated in a criminal activity with the defendant, the jury may infer that the witness and the defendant did engage in that particular criminal activity together, and it is inappropriate for the prosecutor to use or rely on that inference to make his case.  *See* R&R at 17-18 (applying *Namet v. US*, 373 U.S. 179, 185-86 (1963)).  The Magistrate correctly reasoned, however, that Jackson's initial invocation of the privilege could lead the jury to infer only that he had borrowed drug-purchase money from Shannon, not that Shannon had committed the charged crimes against him. *See* R&R at 18 ("The crimes with which Petitioner was charged were only tangentially related to [victim] Jackson's attempt to purchase marijuana with money borrowed from Petitioner.  Instead, the crimes with which Petitioner was charged related to his subsequent attempt to murder Jackson.").[1]  Shannon has not objected to this portion of the R&R's Fifth Amendment analysis.

---

[1]

*See also US v. Clark*, 988 F.2d 1459 (6th Cir. 1993):

[T]he prosecution asked cross-examination questions of the two witnesses in an effort to impeach their credibility.  These questions sought personal information about the witnesses not addressed on direct examination, concerning illicit activities which might tarnish their credibility. * * * *We cannot say the court erred . . . . [A]ny adverse inference had no relation to the question of whether [defendant] Clark killed Rector.  The witnesses . . . invok[ed] the privilege only against questions concerning their own criminal activities.*  The possible inferences that the witnesses may have been involved in criminal car theft activities with the defendant suggests they may have had a motive for providing defendant with an alibi, an issue of credibility, not incrimination.

Second, the Magistrate correctly rejected the argument that the prosecutor committed misconduct by calling victim Jackson to testify when he knew that Jackson would attempt to invoke his fifth Amendment privilege against self-incrimination.  The Magistrate reasoned that

> [t]here is no evidence that the prosecutor knew that Jackson would attempt to assert his Fifth Amendment privilege[2] . . . .  Moreover, even if Jackson had prior to trial indicated the desire to assert the privilege . . . "the prosecutor need not accept at face value every asserted claim of privilege, no matter how frivolous."  As previously noted, the trial court determined that there existed no legitimate basis for Jackson to assert his Fifth Amendment privilege not to testify.  Furthermore, considering that Jackson was the target of Petitioner's [charged] criminal actions[,] the prosecutor properly called Jackson to testify.

R&R at 19 (quoting *Namet*, 373 U.S. at 188); *see, e..g, Haskins v. Lecureux*, No. 92-2090, 16 F.3d 1219, 1994 WL 43388, *2 (6th Cir. Feb. 11, 1994) (Kennedy, Batchelder, E.D. Ky. D.J. Wilhoit) ("Contrary to Appellant's assertion, the trial court did not simply accept Stephen's assertion of his Fifth Amendment privilege at face value."); *Martin-Trigona v. Gouletas*, 634 F.2d 354, 361 (7th Cir. 1980) ("The trial court was not bound to accept at face value what little explanation Trigona did offer in support of his Fifth Amendment claim.  'It is clear that the trial court has discretion to assess the facts which underlie an asserted claim of Fifth Amendment privilege.'") (citation omitted); *US v. Colyer*, 571 F.2d 941, 945 n.3 (5th Cir. 1978) ("[W]hen a witness invokes the privilege against self-incrimination, the trial court *cannot* accept the witness's claims at face value but must conduct a searching inquiry into the validity and extent of the witness's claim . . . .") (citation omitted).

*Id.* at 1463-64 (emphasis added).

[2] *Contrast US v. Okeezie*, No. 92-1583, 985 F.2d 562, 1993 WL 20997, *12 (6th Cir. Jan. 29, 1993) (although Circuit ultimately found that new trial was not warranted, it was troubled by fact that "*the prosecutor knew that Richards would not testify because Richards had stated in an evidentiary hearing prior to trial that she would not testify.*  In denying defendant's motion for a new trial, the district court [nonetheless] found that the government had an 'obligation' to explain why Richards was not testifying . . . .") (emphasis added).

It was well within the trial court's discretion to form (and act on) the belief that victim Jackson's real reason for not wanting to testify was not a fear of self-incrimination, but fear that his testimony would inculpate and therefore infuriate Shannon, inviting fatal retaliation.  *See Martin-Trigona v. Gouletas*, 634 F.2d 354, 361 (7th Cir. 1980) ("The trial judge in appraising the claim [of Fifth Amendment privilege] 'must be governed as much by his personal perception of the peculiarities of the case as by the facts actually in evidence.'") (quoting *Hoffman v. US*, 341 U.S. 479, 487 (1951) (citation to ancient Sixth Circuit decision omitted))).

Shannon objects that as soon as Jackson said "But I can plead the Fifth!", the trial court should have removed the jury from the box and held a hearing.  Objections at 1-2.  Shannon contends that this alleged error was not corrected or rendered harmless merely because Jackson ultimately agreed to testify, because the judge allowed the prosecutor to badger Jackson into abandoning the privilege and testifying. *Id.* at 2.  Shannon's objection is unavailing for several reasons.

First of all, Shannon has not shown that the prosecution knew that victim Jackson definitely would invoke his Fifth Amendment privilege.  *See, e.g., US v. Torrez-Ortega*, 184 F.3d 1128, 1137 (10th Cir. 1999) ("There is no evidence before us that the prosecutor knew in advance of trial that Valdez definitely would not testify.  Where the prosecution could have reasonably assumed that the possibility of being cited for contempt by the court would force [the witness] to testify, there is no misconduct in the decision to call that witness.") (citation and internal quotation marks omitted).[3]

---

[3]

*See also Todaro v. Fulcomer*, 944 F.2d 1079 (3d Cir. 1991):

Counsel for the defense points only to the opinion of the Pennsylvania Supreme Court as evidence that the prosecuting attorney had knowledge of Kinsey's plan to invoke his Fifth Amendment privilege prior to trial.  *See Commonwealth v. Todaro*,

Second, Shannon points to no Supreme Court decision holding that the right to a fair trial is violated merely by the prosecution calling a witness when it knows he will invoke his Fifth Amendment privilege. Third, Shannon identifies no Supreme Court decision holding that pressure to testify is tantamount to pressure to testify *falsely* for the prosecution. *See Morgan v. Bennett*, 204 F.3d 360, 371 (2d Cir. 2000) ("[P]ressure merely to testify does not indicate pressure to falsify.").

Moreover, whether or not the prosecutor knew or suspected that victim Jackson would invoke his Fifth Amendment privilege, the fact remains that Jackson was ultimately persuaded to testify. The jury heard Jackson's testimony, but it also saw his reluctance to testify, and Shannon's counsel had the opportunity to cross-examine Jackson with an eye toward suggesting to the jury that his reluctance to testify was a reason to doubt his truthfulness. In other words, Shannon's counsel could have cross-examined Jackson in a way that stated or implied to the jury that Jackson was inculpating Shannon only because he wishes to please the court or the prosecution. *See* Objections at 3, where Shannon himself argues precisely that: "Mr. Jackson was so scared at that point he told the court anything they wanted to hear."

**Finally, Shannon objects to the Magistrate's apparent acceptance of the state trial court's determination that there was no legitimate basis for Jackson to assert his Fifth Amendment privilege against self-incrimination.** Objections at 2. Shannon emphasizes that Shannon was understandably reluctant to admit under oath that he had "robbed people, robbed an

---

569 A.2d 333, 334 (counsel for Todaro complained at sidebar of prosecutor's prior knowledge). However, the record reveals that defense counsel made no such statement. *See supra*, at 1081. Moreover, *defense counsel does not presently allege that he told the prosecuting attorney that Kinsey would not testify.*

*Id.* at 1083 n.1 (emphasis added).

ATM machine, admitted stealing a gun, being a felon in possession of a weapon[,] and also [committing] armed robbery."  Objections at 2-3.  The United States Supreme Court has held, however, that even if a witness could properly invoke his Fifth Amendment privilege as to certain questions, it is still proper to question him if he can provide non-privileged testimony which tends to support the prosecution's theory.  *Namet*, 373 U.S. at 188.  Even assuming *arguendo* that victim Jackson had a sound Fifth Amendment basis for refusing to testify about his own alleged crimes recited above, the prosecution still could properly question him about all the matters needed to support the instant convictions (assault with the intent to commit murder, first-degree home invasion, and possession of a firearm during commission of a felony).  *See US v. Coppola*, 479 F.2d 1153, 1160 (10th Cir. 1973) ("[T]he privilege is not a prohibition against inquiry and cannot be effectively raised before the question is asked and is applicable only to particular questions.") (citing, *inter alia*, *US v. Terry*, 362 F.2d 914, 917 (6th Cir. 1966)).  Specifically, Shannon has identified no Fifth Amendment basis for Jackson to refuse to testify that (1) he borrowed money from Shannon; (2) he failed to repay some of the money; (3) about a week before Shannon shot Jackson, Shannon had accosted him and warned that he had better repay the money; and (4) on the day in question, Shannon entered Jackson's home without permission, pointed a gun at Jackson, expressly threatened to kill Jackson, and in fact intentionally shot and seriously wounded Jackson.

For these reasons, under the circumstances it was not error, let alone reversible error, for the prosecutor to call victim Jackson, for the trial court to discuss with Jackson in the presence of the jury the true basis for his initial refusal to testify, or for the trial court to let the victim testify despite his initial purported invocation of the Fifth Amendment privilege against self-incrimination.

**The Magistrate Judge also correctly concluded that the Michigan Court of Appeals did**

**not act contrary to, or unreasonably apply, clearly established federal law when it determined that the state trial judge did not commit judicial misconduct by "forcing" victim Jackson to testify.** As the Magistrate pointed out, Shannon's reliance on *Webb v. Texas*, 409 U.S. 95 (1972) is misplaced, because *Webb* is readily distinguishable from his case. In *Webb*, the Supreme Court held that the trial court violated the defendant's right to a fair trial by instructing only the defendant's lone intended witness, and not the prosecution's witnesses, that he had no obligation to testify and that he could face serious penalties for perjury if he lied while testifying. That asymmetric treatment, the Court held, "effectively drove" the defendant's lone witness "off the stand, and thus deprived [him] of due process of law." *See* R&R at 20-21 (discussing *Webb*, 409 U.S. at 95-98). Here, by contrast, the Michigan trial judge did not caution victim Jackson before he took the stand, and when Jackson took the stand, the trial judge said nothing about dire consequences if Jackson testified untruthfully. Moreover, unlike the intended defense witness in *Webb*, Jackson did testify and was subject to cross-examination by Shannon's counsel. *See* R&R at 21.

Shannon objects, "The Magistrate stated that the trial judge did not admonish Jackson." Objections at 3. This is inaccurate. What the Magistrate wrote is that the trial judge did not admonish Jackson *before he took the stand*, and that, when he did instruct Jackson on the stand, he did not scare the witness with a warning about the adverse consequences of false testimony like the trial judge in *Webb*. The Magistrate accurately characterized the statements of Shannon's trial judge and accurately contrasted them with the statements of the trial judge in *Webb*. The Michigan Court of Appeals did not err, let alone clearly err or act contrary to Supreme Court precedent, in rejecting Shannon's assertion that "Jackson was so scared at that point [that] he told the court anything they

wanted to hear." *See* Objections at 3. Nor is there any basis for Shannon's statement that "[j]ust as in *Webb*, the Court did not want a witness to testify, so the witness did not", Objections at 3, because Jackson did in fact testify after his exchange with the judge and prosecutor regarding the Fifth Amendment privilege.

  **The Magistrate Judge also correctly concluded that the Michigan Court of Appeals did not act contrary to, or unreasonably apply, clearly established federal law when it determined that the evidence was sufficient to support the jury verdict.** Following *Jackson v. Virginia*, 443 U.S. 307 (1979), the Magistrate asked whether, viewing the evidence in the light most favorable to the prosecution and according the benefit of all reasonable inferences to the prosecution, any rational trier of fact could have found Shannon guilty beyond a reasonable doubt of the three charges against him. *See* R&R at 22 (citing *O'Hara*, 499 F.3d at 499); *see also US v. Robinson*, – F.3d –, –, 2008 WL 4964148, *6 (6th Cir. Nov. 24, 2008) and *US v. Coffee*, 434 F.3d 887, 895 (6th Cir. 2006) (Griffin, J.) (both quoting *Jackson*). Again following *Jackson*, the Magistrate noted that where the record supports conflicting inferences, the court "must presume – even if it does not affirmatively appear in the record – that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution." *See* R&R at 22 (quoting *O'Hara*, 499 F.3d at 499); *see also Krueger v. Harry*, 2008 WL 3889627, *4 (W.D. Mich. Aug. 18, 2008) (Miles, J.) (citing *Wright v. West*, 505 U.S. 277, 296-97 (1992)) and *Riddle v. Caruso*, 2008 WL 216339, *32 (W.D. Mich. Jan. 23, 2008) (Enslen, J.) (citing *O'Hara*, 499 F.3d at 499).

  After reviewing the elements of Michigan first-degree home invasion, Michigan assault with the intent to commit murder, and Michigan possession of a firearm during the commission of a felony, *see* R&R at 22-23, the Magistrate correctly concluded that the evidence, viewed as directed

by *Jackson v. Virginia*, could support convictions of all three offenses, *see* R&R at 23.  The

Magistrate rejected Shannon's argument that Jackson was an incompetent witness and thus his

testimony should not be considered when determining whether the evidence is sufficient to support

his convictions.  The Magistrate agreed with the Michigan Court of Appeals' statement as follows:

> Not only do the facts in the record contradict defendant's premise [that Jackson's testimony was unreliable and uncorroborated], but we leave such questions of credibility to the trier of fact.  The victim's reluctance to testify and his testimonial inconsistencies affected his credibility, not his competence.  Therefore, the testimony was properly offered and provided sufficient basis for the jury's verdict.

R&R at 23-24 (quoting *People v. Shannon*, 2004 WL 1779012, *2 (Mich. App. Aug. 10, 2004)).

Shannon's objection on this score reads, in its entirety,

> I object to the Magistrate's Report concluding sufficient evidence existed to support Petitioner's conviction.  The Magistrate basically substantiated this by adopting the Michigan Court of Appeals opinion instead of looking at the argument against the Michigan Court of Appeals opinion.  The victim's competence <u>should</u> be questioned along with his credibility.  Mr. Jackson said he would lie, he said the court was forcing him and said he would do whatever he had to do to survive.  His competence was affected by pressures from the judge and prosecutor.  Nothing the witness stated was reliable and his competence should be questioned as to whether it is fact or fiction.

Objections at 4.  As discussed above, Shannon has not shown that the trial judge or the prosecutor

impermissibly coerced him to testify, let alone that they coerced or pressured him into testifying

falsely.  Nor is it accurate to state that "Jackson said he would lie", presumably, Shannon implies,

to lie in the prosecution's favor.  (On the contrary, Jackson stated in court that he feared retaliation

from Shannon if he testified, not that he feared the consequences from the court or prosecution if

he refused to testify.)

Moreover, Shannon identifies no United States Supreme Court precedent to support his

argument that Jackson's reluctance to testify, or the alleged inconsistencies in his testimony, bear

on Jackson's competence as a witness rather than merely his credibility.  And, as the Michigan Court

of Appeals correctly held, it is for the jury to assess a witness's credibility, not a reviewing court.

*See Schlup v. Delo,* 513 U.S. 298, 330 (1995) ("[U]nder *Jackson*, the assessment of the credibility

of witnesses is generally beyond the scope of review."); *Matthews v. Abramajtys*, 319 F.3d 780, 788-

89 (6th Cir. 2003) ("A reviewing court does not reweigh the evidence or redetermine the credibility

of the witnesses whose demeanor has been observed by the factfinder.  It is the province of the

factfinder to weigh the probative value of the evidence and resolve any conflicts in testimony.")

(citing *Marshall v. Lonberger*, 459 U.S. 422, 434 (1983) ("28 U.S.C. § 2254(d) gives federal habeas

courts no license to redetermine credibility of witnesses . . . .")).

**The Magistrate Judge also correctly concluded that the Michigan Court of Appeals did
not act contrary to, or unreasonably apply, clearly established federal law when it determined
that the state trial judge did not err, let alone commit federal constitutional error, by
admitting Chisa Wilson's testimony under the excited-utterance exception to the hearsay rule.**
*See* R&R at 24-25.  As the Magistrate noted, federal habeas corpus relief does not lie for errors of

state law.  R&R at 25 (quoting *Estelle v. McGuire*, 502 U.S. 62, 67 (1991)); *see also Gilmore v.
Taylor*, 508 U.S. 333, 342 (1993) (Rehnquist, C.J.) (citing *Estelle*, 502 U.S. 62); *Richmond v. Lewis*,

506 U.S. 40, 51 (1992) (O'Connor, J.) (citing *Lewis v. Jeffers*, 497 U.S. 764, 780 (1990) (citing,

*inter alia*, *Pulley v. Harris*, 465 U.S. 37, 41 (1984))).

The Magistrate recognized that federal habeas relief can be warranted if an error under state

evidentiary law is "so egregious that it results in a denial of fundamental fairness", R&R at 25

(quoting *Bugh v. Mitchell*, 329 F.3d 496, 512 (6th Cir. 2003)); *see also Ege v. Yukins*, 485 F.3d 364,

375 (6th Cir. 2007) (stating that the *Bugh* principles "have their roots in the Supreme court decision

of *Chambers v. Mississippi*, 410 U.S. 284, 302-03 (1973)).  Here, it was not even erroneous, under Michigan evidence law, to admit Chisa Wilson's testimony under the excited-utterance exception to the hearsay rule, so it cannot have been error so egregious as to be fundamentally unfair to Shannon (as required to predicate federal habeas relief on an error of state law), *reh'g & reh'g en banc denied* (6ᵗʰ Cir. July 30, 2007).  In any event, even if Wilson's testimony were hearsay not eligible for the excited-utterance exception or any other exception under Michigan evidence law, the United States Supreme Court has held that the admission of hearsay does not violate the Constitution if the declarant testifies at trial and is subject to cross-examination.  *See* R&R at 25 (citing *Crawford v. WA*, 541 U.S. 36 (2004)).  *See also US v. Owens*, 484 U.S. 554, 567 (1988) ("Confrontation Clause does not bar admission of out-of-court statement where defendant has 'the benefit of full and effective cross-examination of' [declarant]") (Scalia, J.) (quoting *Nelson v. O'Neil*, 402 U.S. 622, 629 (1971)).  Jackson did testify at trial and was subject to cross-examination.

**The Magistrate Judge also correctly concluded that the Michigan Court of Appeals did not act contrary to, or unreasonably apply, clearly established federal law when it determined that the state trial judge did not give an impermissibly coercive deadlock instruction to the jury.**  After recounting the state trial judge's deadlock instruction, *see* R&R at 26, the Magistrate recognized her obligation to "consider the supplemental charge given by the trial court 'in its context and under all the circumstances.'" R&R at 27 (quoting *Lowenfield v. Phelps*, 484 U.S. 231, 237 (1988) (citing *Jenkins v. US*, 380 U.S. 445, 446 (1965)).  The Magistrate correctly found that the Michigan Court of Appeals applied the correct standard, enunciated by the Supreme Court in *Lowenfield*, urging the jurors "to keep an open mind, but not to give up their own opinions."  R&R at 28 (quoting *People v. Shannon*, 2004 WL 1779012, *3 (Mich. App. Aug. 10, 2004)).

-13-

Shannon's objection on this score reads as follows, in its entirety,

> I object to Magistrate Carmody's Report (pg 28) where she states, "the Trial Judge's comments hardly constitute coercion during Jury Deliberations." A jury can find a defendant guilty or not guilty in as little as ten minutes. The Judge telling the jury they are not deadlocked is in effect coercion. The testimony of the victim/witness Jackson was incredulous [sic]. The jurors made up their minds that some agreed with the prosecution's case, and some disagreed. Neither wanted to budge. The jurors, after the Judge told them they are not deadlocked[,] did lose their individuality when the Judge decided how long they should deliberate.

> This same jury, [having] seen the same Judge admonish and badger a witness along with the prosecutor, more than likely they felt that unless they became unanimous they too would be held against their will, or if they held out, possibly be admonished and humiliated individually. That is enough to make a juror to give up their individuality and habeas relief should be granted.

Objections at 5. Shannon does not attempt to challenge the Magistrate's observations that the state trial judge's deadlock instruction did not inquire as to the numerical breakdown or status of the jurors while they were deliberating, *contrast Brasfield v. US*, 272 U.S. 448 (1926), and did not single out any juror or jurors for being inclined toward a minority viewpoint. *See* R&R at 28 (applying *Williams v. Parke*, 741 F.2d 847, 850-52 (6th Cir. 1984)).

Moreover, Shannon asserts that a juror can sometimes reach a verdict in a criminal case in as little as ten minutes, implying that the trial judge committed reversible error because he did not declare a hung jury after three hours. But Shannon does nothing to address the Supreme Court precedent holding that when the jury has deliberated for a brief period of time, it is not improper for the trial judge to instruct them to deliberate further. In the decision relied on by the Magistrate, the Supreme Court remarked, "Surely if the jury had returned from its deliberations after only one hour and informed the court that it had failed to achieve unanimity after the first ballot, the court would incontestably have had the authority to insist that they deliberate further." *Lowenfield*, 484 U.S. at 238.

More damaging to Shannon's argument is *Early v. Packer*, 537 U.S. 3 (2002). There, the state-court jury had already delivered sealed verdict forms finding the defendant guilty on two counts of attempted robbery, two counts of assault with a deadly weapon, and one count of assault with a firearm, and finding him not guilty of ten other charges, but had not yet reached a verdict on the charges of second-degree murder and attempted murder. *Early*, 537 U.S. at 4. After the jury had deliberated for *twenty-eight hours*, one juror submitted a note asking the judge to excuse her for health reasons. The judge met with the juror privately and she agreed to "hold out just a little bit longer." *Id.* The next day, the foreman sent the judge saying that "we can no longer deliberate", that the ill or tired juror "does not appear to be able to understand the rules as given by you", that "nearly all my fellow jurors questio[n] her ability to understand the rules and her ability to reason", and that continuing deliberations would result in a "hung jury . . . based on . . . one person's inability to reason or desire to be unreasonable." *Id.* at 4. The judge called the jurors into the courtroom, read the note aloud, and asked the foreman if the jury was still deliberating. The foreman responded that the jurors were "just having the same conversation over the same issue time and time again." *Id.* at 5. The judge made the following statement to the jury,

> The juror has a right to do that, as you all know. They have a right to disagree with everybody else. But they do not have a right to not deliberate. They must deliberate and follow the rules and laws as I state it to them.

*Id.* at 5. After the judge asked the breakdown and the foreman said that it was 11-to-1, the foreman stated that further deliberations would be helpful. *Id.* The judge gave further instructions, and overruled the defense counsel's objection that he was instructing the jury as to their manner of deliberation. *Id.* The judge then excused the jurors for the day (Wednesday). *Id.* at 5-6.

After a day off, the jurors resumed deliberations on a Friday. *Early*, 537 U.S. at 6. Once

again, the same juror sent the judge a note asking to be dismissed, explaining that she was angry and was experiencing feelings of distrust and disrespect from the other jurors. The judge met with her privately but sent her back to continue deliberating. *Id.* Then the judge met briefly with the foreman, who assured him that the complaining juror was indeed continuing to deliberate. *Id.* The jury resumed its deliberations for the remainder of Friday, on Monday, and on Tuesday, when it returned guilty verdicts on the second-degree murder and attempted murder counts. *Id.*

The United States Supreme Court unanimously held that the defendant was not entitled to federal habeas relief, stating, "Even if we agreed with the Ninth Circuit majority . . . that there was jury coercion here, it is at least reasonable to conclude that there was not, which means that the state court's determination to that effect must stand." *Early*, 537 U.S. at 11. The length of deliberations, and the nature and extent of the trial judge's instructions to the jury during deliberations in Shannon's case pale in comparison to the trial judge's actions in *Early*.

Finally, because the Michigan Court of Appeals did not act contrary to United States Supreme Court precedent, nor unreasonably apply that precedent, in rejecting each of Shannon's claims on its merits, it did not act contrary to United States Supreme Court precedent or unreasonably apply that precedent in rejecting his *cumulative*-error claim. *See* R&R at 28-29.

**ORDER**

Shannon's objections [document # 38] are **OVERRULED.**

The Report and Recommendation [document # 37] is **ADOPTED.**

The habeas corpus petition [document # 1] is **DISMISSED**.

This is a final and appealable order.

**IT IS SO ORDERED this 5th day of December 2008.**

/s/ Paul L. Maloney
Honorable Paul L. Maloney
Chief United States District Judge